**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

D.R.T., an individual,

                **Plaintiff,**

      **v.**

WYNDHAM HOTEL & RESORTS, INC.;
TRAVEL + LEISURE CO.; WYNDHAM
HOTEL GROUP, LLC; and SLEEPLAND
INC.

G6 HOSPITALITY, LLC; G6
HOSPITALITY FRANCHISING, LLC;
SBC HOSPITALITY LLC; and ANIL &
KIRAN PATEL;

RED ROOF INNS, INC; RED ROOF
FRANCHISING, LLC; and MEI-LEE
CHOU

            **Defendants.**

Case No. _____

JUDGE _____

**DEMAND FOR JURY TRIAL**

## **COMPLAINT**

Plaintiff D.R.T. ("Plaintiff" or "D.R.T."), respectfully submits this complaint under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595 ("TVPRA") and the Child Abuse Victims' Rights Act, 18 U.S.C. § 2255 ("CAVRA"). A.C., by and through her undersigned counsel, makes the following averments, all upon information and belief.

## **INTRODUCTION**

1.     Plaintiff D.R.T. was a 12-year-old child when she was held hostage and sold for sex at hotels owned, operated, maintained, and controlled by Defendants Wyndham Hotel &

Resorts, Inc. ("Wyndham"), Travel + Leisure Co. (fka Wyndham Worldwide), Wyndham Hotel Group, LLC ("Wyndham Hotels"), and Sleepland Inc. ("Sleepland")[1], Defendants G6 Hospitality, LLC ("G6"), G6 Hospitality Franchising ("G6 Franchising"), SBC Hospitality LLC ("SBC Hospitality"), and Anil and Karan Patel (Buena Park Motel 6 Franchisees")[2], and Defendants Red Roof Inns, Inc. ("RRI"), Red Roof Franchising, LLC ("RRF"), and Mei-Lee Chou ("Chula Vista Red Roof Franchisee")[3].

2.          D.R.T. was clearly a very young child under the coercive control of her traffickers when she was held prisoner in hotels owned, operated, maintained, and controlled by Defendants and their agents and employees. Defendants monitored and had control over each of these hotels. Yet, Defendant and their agents and employees continued to rent rooms to D.R.T.'s traffickers, choosing to turn a blind eye to her suffering so that they could continue benefitting financially from D.R.T.'s trafficking.

3.          From approximately 2015 through 2016, and again in 2020, from age 12 through 13, and 17, D.R.T. was forced, as a minor, to have sex against her will in Defendants' hotel rooms where she endured violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation. D.R.T.'s traffickers forced her onto Defendants' property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse. D.R.T. was raped multiple times per day by multiple men in Defendants' hotel rooms.

---

[1] Defendants Wyndham Hotel & Resorts, Inc. ("Wyndham"), Travel + Leisure Co. (fka Wyndham Worldwide), Wyndham Hotel Group, LLC ("Wyndham Hotels"), and Sleepland Inc. ("Sleepland") shall collectively be referred to as "Wyndham Defendants."

[2] Defendants G6 Hospitality, LLC ("G6"), G6 Hospitality Franchising ("G6 Franchising"), SBC Hospitality LLC ("SBC Hospitality"), and Anil and Karan Patel (Buena Park Motel 6 Franchisees"), shall collectively be referred to as "G6 Defendants."

[3] Defendants Red Roof Inns, Inc. ("RRI"), Red Roof Franchising, LLC ("RRF"), and Mei-Lee Chou ("Chula Vista Red Roof Franchisee"), shall collectively be referred to as "Red Roof Defendants."

4.    Defendants monitored the hotels and controlled the day to day activities at these hotels where there were numerous red flags of trafficking, including but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting certain rooms next to each other and away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large numbers of used condoms in the trash; unusually large amounts of male visitors going in and out of D.R.T.'s room at all hours of the day and night; visible signs of physical abuse; women wearing clothing inappropriate for the weather; and loud noises of abuse and other violence audible to staff and/or other rooms.

5.    There is no doubt that Defendants knew, or at a minimum should have known, that they were profiting from D.R.T.'s trafficking.

6.    At some point, D.R.T. was able to escape the grasps of her trafficker and the prison of the Defendants' hotel and motel rooms. D.R.T. was able to escape her first trafficker after he was arrested and prosecuted for his crimes against D.R.T. D.R.T. was rescued, in a hotel, by the Santa Ana Police Department, and was found with a black eye, extensive bruising all over her body, and a scar on her arm. Following an investigation, D.R.T.'s trafficker was found guilty by a jury of the following: Lewd Acts upon a child under 14, Human trafficking of a minor, pimping a minor, pandering with a minor under 16 years old by procuring, oral copulation of a child under 14, and unlawful sexual intercourse. D.R.T.'s trafficker is currently serving 23 years to life in a California State Prison.

7.    Years later, D.R.T. was subjected to human trafficking, as a minor, by another trafficker. The second man trafficker her for nearly three (3) months before she was able to make her escape.

8.    D.R.T. has spent a considerable amount of time attempting to regain the life that

was stripped away from her by her trafficking.

9.        D.R.T. files this lawsuit seeking justice for the harm she suffered as a result of the heinous acts committed against her while she was being sold for sex Defendants' hotels and motels. Defendants and their agents and employees, whom all knew or should have known, that they were benefiting from D.R.T.'s sex trafficking, yet turned a blind eye to her suffering.

## **PARTIES**

10.        Plaintiff D.R.T.  is a natural person and a resident and citizen of Los Angeles, California.

11.        D.R.T.  is a victim of human trafficking pursuant to 22 U.S.C. § 7102(17) and (18) U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 11 U.S.C. § 7102(16).

>       a.    Due to the sensitive and intimate nature of the issues, D.R.T.  requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after. [4]

>       b.    Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[5] However, there are exceptions when the issues involved are of a sensitive and personal nature. [6] For good cause, the Court

---

[4] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[5] Fed. R. Civ. P. 10(a).

[6] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th

4

may issue an order to protect a part or person from annoyance, embarrassment, oppression or undue burden or expense.[7]

c. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. D.R.T. fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d. D.R.T. should not be compelled to disclose her identity in order to maintain her privacy and safety. D.R.T.'s privacy interest substantially outweighs the customary practice of judicial openness.[8]

e. Moreover, Defendants will not be prejudiced. D.R.T. will agree to reveal her identity to Defendants for the limited purpose of investigating D.R.T.'s claims once the parties have entered into a protective order. D.R.T. simply seeks redaction of D.R.T.'s personal identifying information from the public docket and assurances that Defendants will not use or publish D.R.T.'s identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

12. **Defendant Wyndham Hotel & Resorts, Inc.** ("Wyndham") is a large hotel brand with nearly 9,000 branded properties worldwide. Wyndham is a Delaware corporation with its principal place of business in Parsippany, NJ.

---

Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[7] Fed. R. Civ. P. 26(c).

[8] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

13.    Wyndham maintains a registered agent in Ohio, and it can be served through its registered agent, Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, OH 45202.

14.    Wyndham Corporate is the successor entity to **Defendant Travel + Leisure Co. (fka Wyndham Worldwide Corporation)** retains successor liability for the wrongful acts of its predecessor. Wyndham Corporate's 10k from 2022 states filing with the Securities and Exchange Commission ("SEC") in 2022:

> We are one of the world's largest hospitality companies, offering travelers a wide range of hospitality services and products through our global portfolio of worldrenowned brands. The hospitality industry is a major component of the travel industry, which is one of the largest retail industry segments of the global economy. Our portfolio of brands have a significant presence in many major hospitality markets in the United States and throughout the world and are uniquely positioned to provide travelers access to a large assortment of travel accommodations and destinations.

> Our brands include: Wyndham Hotels and Resorts, Ramada, Days Inn, Super 8, Howard Johnson, Wingate by Wyndham, Microtel Inns & Suites by Wyndham, TRYP by Wyndham, Dolce Hotels and Resorts, RCI, Landal GreenParks, Novasol, Hoseasons, cottages.com, James Villa Holidays, Wyndham Vacation Rentals, Wyndham Vacation Resorts, Shell Vacations Club and WorldMark by Wyndham.

15.    Defendant Wyndham Corporate's 10K filing with the SEC in 2022 states that Wyndham Corporate was spin off from Wyndham Worldwide, now known as Travel + Leisure Co., which was the former parent:

> Our business was initially incorporated as Hospitality Franchise Systems, Inc. in 1990 to acquire the Howard Johnson brand and the franchise rights to the Ramada brand in the United States. It was an integral part of Wyndham Worldwide Corporation and its Case: 2:25-cv-00472-SDM-CMV Doc #: 1 Filed: 04/30/25 Page: 8 of 51 PAGEID #: 8 9 predecessor from 1997 to 2018. Wyndham Hotels became an independent, public company in May 2018 when it was spun-off from Wyndham Worldwide, now known as Travel + Leisure Co. ("Travel + Leisure").

16.    Travel + Leisure Co. can be served by its registered agent, Wyndham Worldwide Operations, Inc., located at 6277 Sea Harbor Drive, Orlando, FL 32821.

17.    **Defendant Wyndham Hotel Group, LLC** ("Wyndham Hotel Group"), upon information and belief, is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, Wyndham Hotel Group, LLC is a wholly

owned subsidiary of Wyndham Hotels & Resorts, Inc. and a former subsidiary of Wyndham Worldwide Corporation. Wyndham Hotel Group may be served through its registered agent for service, Corporate Creations Network, Inc - 4000 Eagle Point Corporate Drive, Birmingham, AL 35242.

18.     Wyndham Corporate, Wyndham Hotel Group, and Travel + Leisure Co., are referred to collectively as "Wyndham Defendants."

19.     Super 8 by Wyndham is classified as a value brand hotel.

20.     Wyndham owns, supervises, manages, controls, and/operates the Days Inn located at 7121 Beach Blvd, Buena Park, CA 90620 ("Buena Park Days Inn").

21.     **<u>Defendant Sleepland Inc. ("Wyndham Franchisee" or "Sleepland")</u>** is a general stock corporation operating the Buena Park Days Inn, that is organized and operating under the laws of the State of California. Sleepland can be served by its registered agent, 1505 Northwest Registered Agent Inc., located at 2108 N. Street, Suite N, Sacramento, CA 95816.

22.     Plaintiff's claims against Wyndham Franchisee arise out of Wyndham Franchisee's contacts through Wyndham Franchisee's relationship with Wyndham. Wyndham Franchisee's participation in a joint venture with Wyndham operating Buena Vista Days Inn occurred because:

      a.  The franchising agreement required Wyndham Franchisee to report information to Wyndham, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve Buena Vista Days Inn, including those involving sex trafficking victims like D.R.T.

      b.  Wyndham dictated policies related to safety, security, human trafficking, employee training and response as well as other subjects.

      c.  Wyndham Franchisee had an ongoing obligation to participate in centralized programs operated by Wyndham.

    d.   Reservation information for rooms at Buena Vista Days Inn passed through a system operated and managed by Wyndham.

    e.   Wyndham Franchisee agreed to make all payments due under the franchising agreement at Wyndham.

    f.   Wyndham Franchisee's operation of Buena Vista Days Inn was controlled and/or influenced by many policies set and enforced by Wyndham.

    g.   Wyndham Franchisee signed a software licensing agreement with Wyndham for the property management software, which Wyndham Franchisee used when operating Buena Vista Days Inn, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms.

23.    Defendants benefitted from their operations at the Buena Vista Days Inn in more ways than just through royalty payments, licensing fees, and room revenue. Defendants gathered personal data from the internet and Wi-Fi services it provided to guests, including but not limited to D.R.T. and her traffickers. This data collection provided further value to Defendants, enhancing their ability to market and promote their services while maintaining and promoting a positive public image for their brand.

24.    Whenever reference is made in this amended complaint to any act, deed, or conduct of Defendants, the allegation is that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives, who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Buena Vista Days Inn.

25.    **Defendant G6 Hospitality, LLC.** ("G6") is a large hotel brand with over 1,400 branded properties worldwide.  It is a Delaware limited liability company with its principal place of business in Carrollton, TX and can be served through its registered agent, Corporation Service Company at 50 W. Broad Street, Suite 1330, Columbus, OH 43215. G6 owned, supervised, and/or operated the Motel 6 at 777 W. 6th Street, San Bernardino, CA 92410 ("San Bernardino Motel 6"),

and the Motel 6 located at 7930 Beach Blvd, Buena Park, CA 90620 ("Buena Park Motel 6"). The company also provides franchise opportunities for its hotel and motel brands through **Defendant G6 Hospitality Franchising, LLC ("G6 Hospitality")**, a for-profit Delaware company with its principal place of business in Carrolton, Texas. Together G6 and G6 hospitality will collectively be referred to as "G6 Defendants."

    a. Both San Bernardino Motel 6 and Buena Park Motel 6 are G6 branded properties.

    b. G6 employees worked throughout the San Bernardino and Buena Park Motel 6. G6 employees worked jobs including front desk and housekeeping. G6 is the principal with control over nearly every element of operations at both San Bernardino Motel 6 and Buena Park Motel 6. G6 is liable, either directly, vicariously, or indirectly through an agency relationship for acts and/or omissions of the employees at its branded hotels, including San Bernardino Motel 6 and Buena Park Motel 6 where D.R.T. was trafficked.

    c. G6 controlled and dictated the actions and inactions of San Bernardino Motel 6 and Buena Park Motel 6 through highly specific and detailed brand standards, policies, and procedures.

    d. G6 knowingly benefited, or received something of value, from its ventures at San Bernardino Motel 6 and Buena Park Motel 6 through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where D.R.T. was trafficked, as well as in maintaining a positive public image for San Bernardino Motel 6

and Buena Park Motel 6. G6 also benefited from gathering personal data from the Wi-Fi it provided to customers including D.R.T. and her traffickers.

e. G6 is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. G6 has derived substantial revenue from services rendered in Ohio.

26.    Whenever reference is made in this Complaint to any act, deed, or conduct of G6, the allegation is that G6 engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of G6.

27.    **Defendant SBC Hospitality LLC ("San Bernardino Motel 6 Franchisee" or "SBC Hospitality")** is a limited liability company that operated the San Bernardino Motel 6, that is organized and operating under the laws of the State of California. SBC Hospitality can be served by its registered agent, Rakesh P. Patel, located at 6278 Serena Place, Alta Loma, CA 91737.

28.    Plaintiff's claims against G6 Franchisee arise out of G6 Franchisee's contacts through G6 Franchisee's relationship with G6. G6 Franchisee's participation in a joint venture with G6 operating Dallas Motel 6 occurred because:

h. The franchising agreement required SBC Hospitality to report information to G6, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve San Bernardino Motel 6, including those involving sex trafficking victims like D.R.T.

i. G6 dictated policies related to safety, security, human trafficking, employee training and response as well as other subjects.

j. SBC Hospitality had an ongoing obligation to participate in centralized programs operated by G6.

k. Reservation information for rooms at San Bernardino Motel 6 passed through a system operated and managed by G6.

l. SBC Hospitality agreed to make all payments due under the franchising agreement at G6.

m. SBC Hospitality's operation of San Bernardino Motel 6 was controlled and/or influenced by many policies set and enforced by G6.

n. SBC Hospitality signed a software licensing agreement with G6 for the property management software, which SBC Hospitality. used when operating San Bernardino Motel 6, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms.

29.     **Defendants Anil and Kiran Patel ("Buena Park Motel 6 Franchisees")** are private individuals that operated the Buena Park Motel 6, that was organized and operating under the laws of the State of California. The Buena Park Motel 6 Franchisees can be served by either individual, Anil or Kiran Patel, located at 7930 Beach Blvd, Buena Park, CA 90620.

30.     Plaintiff's claims against Buena Park Motel 6 Franchisees arise out of Buena Park Motel 6 Franchisees' contacts through Buena Park Motel 6 Franchisees' relationship with G6. Buena Park Motel 6 Franchisees' participation in a joint venture with G6 operating Buena Park Motel 6 occurred because:

o. The franchising agreement required Buena Park Motel 6 Franchisees to report information to G6, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve Buena Park Motel 6, including those involving sex trafficking victims like D.R.T.

p. G6 dictated policies related to safety, security, human trafficking, employee training and response as well as other subjects.

q. Buena Park Motel 6 Franchisees had an ongoing obligation to participate in centralized programs operated by G6.

r. Reservation information for rooms at Buena Park Motel 6 passed through a system operated and managed by G6.

     s.   Buena Park Motel 6 Franchisees agreed to make all payments due under the franchising agreement at G6.

     t.   Buena Park Motel 6 Franchisees' operation of Buena Park Motel 6 was controlled and/or influenced by many policies set and enforced by G6.

     u.   Buena Park Motel 6 Franchisees signed a software licensing agreement with G6 for the property management software, which Buena Park Motel 6 Franchisees used when operating Buena Park Motel 6, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms.

31.    **Defendant Red Roof Inns, Inc. ("RRI")** is a publicly traded company. The company provides franchise opportunities for its hotel and motel brands through **Defendant Red Roof Franchising, LLC ("RRF")**.[9] Red Roof purchases, owns, and manages a network of hotels and motels globally, primarily in the Midwest, Southern, and Eastern United States. Red Roof serves customers throughout the United States and other countries throughout the World.

32.    RRI is a global hotel brand with approximately 650 branded properties worldwide. It is a Delaware corporation, with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

33.    RRI maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 3366 Riverside Dr. Suite 103, Upper Arlington, Ohio 43221.

34.    RRF was named one of the fastest growing franchises in 2017. It is a Delaware limited liability company with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

---

[9] Upon information and belief, Red Roof Franchising, LLC is a wholly owned subsidiary of Red Roof Inns, Inc. and serves as Red Roof Inns, Inc.'s franchising arm. Defendants RRI and RRF will be collectively

35.     RRF maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 3366 Riverside Dr. Suite 103, Upper Arlington, Ohio 43221.

36.     Red Roof owns, supervises, manages, controls, and/or operates the Red Roof Plus+ located at 394 Broadway, Chula Vista, CA 91910 (Chula Vista Red Roof Plus+).

    a.   The Chula Vista Red Roof Plus+ is a Red Roof branded property.[10]

    b.   Red Roof employees work throughout the Chula Vista Red Roof Plus+. Red Roof employees work jobs including front desk and housekeeping. Red Roof is the principal with control over nearly every element of operations at the Chula Vista Red Roof Plus+. Red Roof is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Chula Vista Red Roof Plus+ where D.R.T. was trafficked.[11] Red Roof has an actual and apparent agency relationship with the physical property owner of the Chula Vista Red Roof Plus+ as to establish vicarious liability.

    c.   Red Roof controlled and dictated the actions and inactions of the Chula Vista Red Roof Plus+ through highly specific and detailed brand standards, policies, and procedures.

    d.   Red Roof knowingly benefited, or received something of value, from its ventures at the Chula Vista Red Roof Plus+ through royalty payments, licensing fees, and percentages of the gross room revenue generated by the

---

[10] *Our Brands*, RED ROOF, https://www.redrooffranchising.com (last visited Jun. 9, 2022); *Red Roof Inn*, RED ROOF, https://www.redrooffranchising.com/red-roof-inn (last visited Jun. 9, 2022).
[11] See, e.g., *Revenue Management*, RED ROOF, https://www.redrooffranchising.com/revenue- management (last visited Jun. 9, 2022) (proclaiming "Our Team is an Extension of Yours").

hotel operations, including rates charged through rooms where D.R.T. was trafficked, as well as in maintaining a positive public image for the Red Roof Inn brand. Red Roof also benefited from gathering personal data from the Wi-Fi it provided to customers, including D.R.T. and her trafficker.

e. Red Roof is subject to the jurisdiction of this Court because its corporate offices are headquartered in this district. In addition, Red Roof regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. Red Roof has derived substantial revenue from services rendered in Ohio.

37.     Whenever reference is made in this Complaint to any act, deed, or conduct of Red Roof, the allegation is that Red Roof engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Chula Vista Red Roof Plus+.

38.     **Defendant Mei-Lee Chou ("Red Roof Franchisee")** is a private individual that operated the Chula Vista Red Roof Plus+, organized under the laws of and operating within the State of California. It can be served by Mei-Lee Chou, located at 421 Evening View Drive, Chula Vista, CA 91914.

39.     D.R.T.'s claims arise out of RRI's actual and apparent agency relationship with their branded hotels, including the Chula Vista Red Roof Plus+, where D.R.T. was trafficked. RRI is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at their branded hotels, including the Chula Vista Red Roof Plus+.

RRI's participation in a venture with their branded properties, including the Chula Vista Red Roof Plus+, occurred, in substantial part, in Ohio because:

a. Upon information and belief, Red Roof's branded properties actively sought out a franchising relationship by contacting Defendants in California.

b. The franchising agreement had a choice of law provision selecting the law of Ohio as the governing law.

c. The franchising agreement required that Red Roof's branded properties irrevocably submit themselves to the jurisdiction of Ohio courts and waived all objections to personal jurisdiction and service of process.

d. The franchising agreement required Red Roof's branded properties to report information to RRI in Ohio, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve, Chula Vista Red Roof Plus+, including those involving sex trafficking victims.

e. Red Roof dictated policies related to safety, security, human trafficking, employee training and response as well as other subjects from their principal place of business in the Southern District of Ohio.

f. The benefit that Red Roof's branded properties received from room rentals was governed by the Ohio franchising agreement.

g. Red Roof's operation of Chula Vista Red Roof Plus+ was controlled and/or influenced by many policies set and enforced by Defendants. Including those policies specifically related to prostitution, commercial sex, human and sex trafficking.

40.    Plaintiff's claims against the Red Roof Franchisee arise out of Red Roof Franchisee's contacts through Red Roof Franchisee's relationship with Red Roof. Red Roof Franchisee's participation in a joint venture with Red Roof operating Chula Vista Red Roof Plus+ occurred, in substantial part, in Ohio because:

   a. Red Roof Franchisee actively sought out a franchising relationship by contacting Red Roof in Ohio.

   b. Red Roof Franchisee acknowledged that the negotiation, execution, and acceptance of the franchising agreement occurred in the Southern District of Ohio.

   c. Red Roof Franchisee agreed that its ongoing performance of the franchising agreement would take place, in part, in the Southern District of Ohio.

   d. The franchising agreement had a choice of law provision selecting the law of Ohio as the governing law.

   e. The franchising agreement required Red Roof Franchisee to report information to Red Roof, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve Chula Vista Red Roof Plus+, including those involving sex trafficking victims like D.R.T.

   f. Red Roof Franchisee agreed to submit all notices required under the franchising agreement to Red Roof in the Southern District of Ohio.

   g. Red Roof dictated policies related to safety, security, human trafficking, employee training and response as well as other subjects.

   h. Red Roof Franchisee had an ongoing obligation to participate in centralized programs operated by Red Roof.

   i. Red Roof Franchisee was required to purchase insurance on behalf of one or more Ohio entities (Red Roof).

   j. Reservation information for rooms at Chula Vista Red Roof+ passed through a system operated and managed by Red Roof.

   k. Payment information for rooms at Chula Vista Red Roof+ passed through a system operated and managed by Red Roof in the Southern District of Ohio.

l.   The benefit that Red Roof Franchisee received from room rentals was governed by the Ohio franchising agreement.

m.   Red Roof Franchisee agreed to make all payments due under the franchising agreement at Red Roof.

n.   Red Roof Franchisee's operation of Chula Vista Red Roof Plus+ was controlled and/or influenced by many policies set and enforced by Red Roof.

o.   Red Roof Franchisee signed a software licensing agreement with Red Roof for the property management software Red Roof, which Red Roof Franchisee used when operating Chula Vista Red Roof+, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms. Red Roof Franchisee agreed to file any lawsuit arising from the licensing agreement in the Southern District of Ohio and waived personal jurisdiction and venue objections.

## JURISDICTION AND VENUE

41.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

42.     The Court has personal jurisdiction pursuant to the Trafficking Victims Protection Reauthorization Act ("TVPRA") and 18 U.S.C. § 2255, Child Abuse Victims' Rights Act ("CAVRA").

43.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendant Red Roof.

## OVERVIEW OF TRAFFICKING

44.     For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking occurring on their properties.

45.     The relationship between a pimp and a prostitute is inherently coercive, and the

United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[12] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

46.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[13]

47.     Defendants knew and have known for decades that they profit from sex trafficking repeatedly occurring under their individually owned properties. Rather than taking timely and effective measures to stop profiting from this epidemic, Defendants chose to ignore the open and obvious presence of sex trafficking on their individually owned properties, benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose.

48.     The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[14] However, traffickers aren't the only profiteers. The hotel industry, including Defendants, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts.

---

[12] See, e.g., A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; Prostitution and Trafficking in Women: An Intimate Relationship, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women intimate-relationship.
[13] Id.
[14] Profits and Poverty: The Economics of Forced Labor, INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

Defendants and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

49.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendants knew or should have known regarding the trafficking of D.R.T. at Defendants' Hotels and Motels.

50.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[15] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[16] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[17] Hotels have been found to account for over 90 percent of commercial exploitation of children.[18]

51.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including the defendants, on best practices for identifying and responding to sex trafficking.[19]

52.     Multiple agencies and organizations who actively combat sex trafficking, including

---

[15] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-traffickingusslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere."

[16] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[17] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wpcontent/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[18] Erika R. George & Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[19] See, e.g., Department of Homeland Security, Blue Campaign Toolkit, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, Child Sex Trafficking Overview, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, Red Flags for Hotel and Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and End Child Prostitution, Child Pornography, and the Trafficking of Children for Sexual Purposes ("ECPAT"), among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[20]

53.     Widely recognized signs of sex trafficking, which can be observed by hotel staff all which Defendants' properties were made of aware of, include but are not limited to:

    a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

    b. Individuals show signs of physical abuse, restraint, and/or confinement;

    c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

    d. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

    e. Individuals lack freedom of movement or are constantly monitored;

    f. Individuals avoid eye contact and interaction with others;

    g. Individuals have no control or possession of money or ID;

    h. Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

    i. Individuals have few or no personal items – such as no luggage or other bags;

---

[20] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, Red Flags for Hotel & Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, Human Trafficking Red Flags, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

j.    Individuals appear to be with significantly older "boyfriend" or in the company of older males;

k.    A group of girls appear to be traveling with an older female or male;

l.    A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m.    Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.    Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.    Possession or use of multiple cell phones; and

p.    Possession or usage of large amounts of cash or pre-paid cards.[21]

54.    The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[22] From check-in to check-out, there are indicators that traffickers and their victims exhibit during their stay at the hotel.

55.    The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Defendants and all industry participants continue to profit thousands from participating in a venture in violation of § 1591(a).

---

[21] *Id.*
[22] Department of Homeland Security, Blue Campaign Toolkit, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

56.     Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of Plaintiff D.R.T. on their properties.

57.     D.R.T. is a survivor of sex trafficking. Key findings from the Polaris Project are that "[s]urvivors of human trafficking are not thriving. The systems that were supposed to protect them before, during and after their human trafficking situations failed and failed miserably. Systems such as child welfare, criminal justice and legal systems failed." https://polarisproject.org/national-survivor-study/

58.     D.R.T. looks to the judicial system, who has been empowered by Congress to provide a remedy to Victim-Survivors pursuant to the TVPRA, 18 U.S.C. § 1595 and 18 U.S.C. § 2255. Defendants knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1595(a).

## FACTUAL BACKRGOUND

### INTRODUCTION

1.     D.R.T. met her first trafficker in 2015, when she was just 12 years old. She was taken from a park after an older man convinced her he would protect her. This man then began to trafficker D.R.T. After escaping this trafficker, D.R.T. was subjected to trafficking again in 2020, at 17 years old. Ultimately, her traffickers came to control every aspect of her life. The defining factor of the relationship between D.R.T. and her traffickers was that each night D.R.T.'s traffickers forced her to have sex with men for money.

2.     D.R.T. brings her claims against the Defendant for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a) and the Child Abuse Victim's Rights Act ("CAVRA"), 18 U.S.C. § 2255 (a).

3.     The TVPRA prohibits Defendants from profiting from any venture they know or

should know involves a violation of § 1595 (a) and thereby establishes a non-delegable duty of reasonable care.

4.      CAVRA allows for any minor that suffers personal injury as a result of child sex trafficking to recover damages. 18 U.S.C. § 2255(a).

5.      An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[23] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

6.      As part of their conspiracy, to save costs and continually reap profits. Upon information and belief, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding suspected incidents of human trafficking at the branded properties—despite the general knowledge in the industry and their own records that human sex trafficking was happening in the hotel industry and in their branded properties. Furthermore, Defendants did not train staff on how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

7.      Upon information and belief, Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences decreased as a result of implementing human trafficking policies and procedures. Defendants did not establish mandatory and secure reporting mechanisms at the point of sale.

---

[23] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

8. Upon information and belief, Defendants did nothing in the face of the human sex trafficking epidemic in their industry. Instead, they continued to profit from the rental of rooms that they knew or should have known were rented and used for the purpose of sex trafficking.

9. Defendants thus failed to act to ensure that it did not benefit from the human sex trafficking occurring at their branded properties. Defendants failed to implement appropriate policies and procedures that a reasonably diligent business would or should have implemented so that it would not continue to benefit from the human trafficking occurring at their branded properties.

10. With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like D.R.T. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties while Defendants reap the benefits.

11. Plaintiff D.R.T. 's injuries are mostly indivisible and cannot be separated. D.R.T. 's injuries are the result of continued instances of ongoing violent, traumatizing sexual exploitation.

12. D.R.T. 's injuries are almost exclusively mental, emotional, and psychological in nature and derive from the trafficking period. The trafficking period is ongoing and continuous and resulting injuries cannot be divided; thereby subjecting Defendants to joint and several liability. Federal common law provides for joint and several liability for indivisible injuries, such as those suffered by D.R.T.

13. Plaintiff's injuries, particularly D.R.T.'s ongoing mental, emotional, and psychological injuries, have no reasonable basis on which to determine the relative contribution of a particular defendant's conduct to the single harm.

14. Violators of Section 1595 of the TVPRA are jointly and severally liable for a victim's damages. Victims are entitled to all compensatory and non-compensatory damages

incurred during their trafficking period. 18 U.S.C. § 1595(a). Thus, Defendants are jointly and severally liable for D.R.T. 's damages in this case.

## THE SEX TRAFFICKING OF PLAINTIFF D.R.T.

15. D.R.T. met her first trafficker when she was just twelve (12) years old.

16. By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, D.R.T. was held captive and sold for sex by her trafficker.

17. During the time that she was trafficked, D.R.T. 's trafficker frequently rented rooms at the Defendants' hotel and motel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with D.R.T.

18. Throughout her trafficking, D.R.T. 's trafficker connected with "johns" by posting or causing to be posted advertisements on various online websites commonly used to advertise commercial sex, such as Backpage and Craigslist, advertising for D.R.T. 's availability for to engage in such acts. D.R.T.'s traffickers posted many of these advertisements and had conversations with "johns" while presumably connected to Defendants' Wi-Fi.

19. D.R.T. was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels and motels.

20. From 2015 to 2016 and 2020, while under the coercive control of her traffickers, D.R.T. was imprisoned in hotels rooms rented by her traffickers and forced to have sex for money.

21. While at Defendants' branded properties, D.R.T.'s traffickers violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape. Her deterioration and poor health conditions were obvious to anyone who saw

her.

22.     During her captivity at Defendants' branded properties, D.R.T.  was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned.

23.     Staff at the Defendants' hotels and motels saw and heard the fights occurring on their properties, including but not limited to involving D.R.T.  and her traffickers, but did not call the police or intervene in any way to help.

24.     Staff at the Defendants' hotels and motels saw visible bruises and injuries on D.R.T. while she was with her traffickers.

25.     When D.R.T. was rescued by police from her first trafficker, she was found to have bruising and scarring over many parts of her body.

26.     At the Defendants hotels and motels, D.R.T.  encountered the same staff on multiple occasions. Defendants staff would have seen the signs of D.R.T. 's deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of Defendants' properties as well as signs of malnutrition and poor health.

27.     Every time D.R.T.  interacted with the Defendants' staff, it was readily apparent that D.R.T.  was under the control of her traffickers.

28.     D.R.T.'s traffickers followed a repetitive and routine procedure during stays at the Defendants' branded properties, and Defendants knew or should have known of D.R.T.'s trafficking because of a variety of factors detailed below.

29.     For years, D.R.T.'s traffickers rotated between hotels and chose the Defendants' locations as their most frequented due to their relationships between traffickers and the hotel employees that allowed the traffickers free reign to conduct their illegal trafficking business.

30.     Due to the relationship between Defendants' employees and D.R.T.'s traffickers, D.R.T. understood that the Defendants' hotels and motels staff, employees, and owners would not help her and that she would likely be beaten or killed if she sought help from them.

31.     Plaintiff's traffickers often had multiple girls at the hotels. There was always foot traffic going in and out of the rooms rented by D.R.T. 's traffickers.

32.     D.R.T. consistently witnessed clear signs of others being sex trafficked at the same time she was trafficked at the Defendants' hotels and motels, meaning it should have been easily detectible upon reasonable inspection.

33.     It became clear to D.R.T. during the time of her trafficking that her traffickers' and the Defendants' sex trafficking operation was a routine business operation and the hotels and motels were welcoming and participating in.

### THE SEX TRAFFICKING OF D.R.T. BUENA PARK DAYS INN

34.     Plaintiff D.R.T. was subjected to sex trafficking at the branded Buena Park Days Inn located at 121 Beach Blvd, Buena Park, CA 90620.

35.     D.R.T. and her first trafficker stayed at the Buena Park Days Inn between 2015 through about June 2016, frequently staying for days at a time, encountering the same staff, within this period.[24]

36.     Hotel staff at Buena Park Days Inn frequently placed D.R.T. and her trafficker in a room away from other guests. There were only male guests in and out of D.R.T. and her trafficker's room while multiple girls, including other underage victims, were kept in a room at once.

37.     On more than one occasion, D.R.T.'s trafficker physically abused her at the Buena

---

[24] It should be noted for the purpose of this complaint, that D.R.T. was at the Buena Park Days Inn with only her first trafficker.

Park Days Inn. D.R.T. 's pain and suffering at the Buena Park Days Inn was ongoing, as loud sounds of abuse and D.R.T. 's screams for help could often be heard from the room.

38.     There was an altercation that took place during one of the many stays at the Buena Park Days Inn, where D.R.T.'s trafficker was yelling and and abusing D.R.T. inside of the room at the Buena Park Days Inn. During this argument, D.R.T. and her trafficker were in a room on the second floor. During the altercation, an employee presumed to be the manager, came to the door and told D.R.T. and her trafficker that they were being kicked out for causing a scene. This employee then accepted $100 cash from D.R.T.'s trafficker, in exchange for him to not kick them out. This employee then stated that he would not call the police, but would kick them out if it happened again.

39.     Further, D.R.T. 's stays at the Buena Park Days Inn resulted in several consistent red flags, including, but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; obvious signs of illegal drug use; frequent requests for linen changes; large number of condoms in the trash; physical abuse in public spaces; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering or soliciting on hotel grounds.

40.     D.R.T.  was repeatedly raped and otherwise sexually abused many times at the Buena Park Days Inn.

41.     Based on information and belief, before and at the time D.R.T.  was trafficked at the Buena Park Days Inn, Wyndham staff saw D.R.T.  being held captive, controlled, drugged, abused, hit, and trafficked for sex there. Wyndham and their employees directly witnessed all signs of sex trafficking, including the trafficking of D.R.T., described above.

42.     Wyndham knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for prolonged stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and out of the rooms where victims were trafficked in; allowing guests to use illicit drugs on property; allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

43.     Wyndham has direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

44.     Based upon information and belief, Wyndham read all online reviews about their property. Numerous reviews were left online about the Buena Park Days Inn that directly put Wyndham on notice of red flags of sex trafficking, including from 2015 through 2016. Reviews specifically mention the property being known by law enforcement for human trafficking, being infested with women presumed to be prostitutes and hookers, women having extensive foot traffic in and out of their rooms, and a male receiving oral sex in the middle of the parking lot.

45.     Information has become public through news stories establishes the pervasive nature of the Defendants role in providing a venue where sex trafficking has occurred for years.

Not only at the location D.R.T. was trafficked, but also at Wyndham hotel locations across the country.

46.     As such, Wyndham knew and should have known that D.R.T. was being trafficked at the Buena Park Days Inn.

47.     At all times relevant, from 2015 through about June 2016, Wyndham profited and directly benefited from the room rentals and other good and things purchased as a direct result of their participation in the sex trafficking venture with D.R.T. 's traffickers for her sex trafficking.

### THE SEX TRAFFICKING OF D.R.T. AT THE SAN BERNARDINO MOTEL 6

48.     Plaintiff D.R.T. was subjected to sex trafficking at the branded Motel 6 located at 777 W. 6th Street, San Bernardino, CA 92410.

49.     D.R.T. and her trafficker stayed at the San Bernardino Motel 6 during 2015 through 2016. D.R.T. and her trafficker usually stayed for multiple days at a time, at least two (2) times per month.

50.     Hotel staff at San Bernardino Motel 6 always placed D.R.T. and her trafficker in a room away from other guests. There were only male guests in and out of D.R.T. and her trafficker's room while multiple girls were kept in a room at once.

51.     D.R.T.'s trafficker was very friendly with the staff at this location. Staff would often work out deals with other traffickers, agreeing that for an extra fee, they were able to run their business out of the San Bernardino Motel 6.

52.     On more than one occasion, D.R.T. 's traffickers physically abused her at the San Bernardino Motel 6.

53.     On one occasion, D.R.T.'s trafficker had beat D.R.T. in the hotel room, resulting in blood being throughout the room. D.R.T. used a towel to clean up the blood. A housekeeper came

to get the linens and asked about the blood on the towel. The housekeeper then said for a cash payment, they would not tell the front desk about the blood. The housekeeper accepted a payment to be quiet about the abuse. At this time, D.R.T. had a bloody and busted lip, and scratches on her arm that were still bleeding.

54.     D.R.T. 's pain and suffering at San Bernardino Motel 6 was ongoing, as loud sounds of abuse and D.R.T. 's screams for help could often be heard from the room.

55.     D.R.T. has asked a housekeeper for help after an altercation with her trafficker. The housekeeper did not provide help or call the authorities.

56.     Further, D.R.T. 's stays at the San Bernardino Motel 6 resulted in several consistent red flags, including, but not limited to: paying for stays in cash; obvious signs of illegal drug use; frequent requests for linen changes; large number of condoms in the trash; physical abuse in public spaces; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering or soliciting on hotel grounds.

57.     D.R.T.  was repeatedly raped and otherwise sexually abused many times at the San Bernardino Motel 6.

58.     Based on information and belief, before and at the time D.R.T.  was trafficked at the San Bernardino Motel 6, G6 staff saw D.R.T.  being held captive, controlled, drugged, abused, hit, and trafficked for sex there. G6 and their employees directly witnessed all signs of sex trafficking, including the trafficking of D.R.T., described above.

59.     G6 knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex

traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for prolonged stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and out of the rooms where victims were trafficked in; allowing guests to use illicit drugs on property; allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

60.     G6 has direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

61.     Based upon information and belief, G6 read all online reviews about their property. Numerous reviews were left online about San Bernardino Motel 6 that directly put G6 on notice of red flags of sex trafficking, including during 2015 through 2016. Reviews specifically mention presumed prostitution activity on the property, the motel is run by drug dealers and prostitutes, cars being stolen from the parking lot, and heavy drug activity.

62.     Information has become public through news stories establishes the pervasive nature of the Defendants role in providing a venue where sex trafficking has occurred for years. Not only at the location D.R.T. was trafficked, but also at G6 hotel locations across the country.

63.     As such, G6 knew and should have known that D.R.T. was being trafficked at the San Bernardino Motel 6.

64.     At all times relevant, during 2015 through 2016, G6 profited and directly benefited from the room rentals and other good and things purchased as a direct result of their participation in the sex trafficking venture with D.R.T. 's trafficker for her sex trafficking.

## THE SEX TRAFFICKING OF D.R.T. AT THE BUENA PARK MOTEL 6

65.     Plaintiff D.R.T. was subjected to sex trafficking at the branded Motel 6 located at 7930 Beach Blvd, Buena Park CA 90620.

66.     D.R.T. and her trafficker stayed at the Buena Park Motel 6 during 2015 through about June 2016. D.R.T. and her trafficker usually stayed for a maximum of three (3) days at a time.

67.     Hotel staff at Buena Park Motel 6 always placed D.R.T. and her trafficker in a room away from other guests. There were only male guests in and out of D.R.T. and her trafficker's room while multiple girls were kept in a room at once.

68.     D.R.T.'s trafficker was very friendly with the staff at this location. Staff at this property would warn D.R.T.'s trafficker of police activity. D.R.T. recalls a time where front desk staff had warned D.R.T.'s trafficker that there was a sting operation at the property just days prior.

69.     On more than one occasion, D.R.T. 's trafficker physically abused her at the Buena Park Motel 6.

70.     D.R.T. 's pain and suffering at Buena Park Motel 6 was ongoing, as loud sounds of abuse and D.R.T. 's screams for help could often be heard from the room.

71.     Further, D.R.T. 's stays at the Buena Park Motel 6 resulted in several consistent red flags, including, but not limited to: paying for stays in cash; obvious signs of illegal drug use; frequent requests for linen changes; large number of condoms in the trash; physical abuse in public spaces; visible signs of prior and private physical abuse; unusually large number of male visitors

coming in and out of the room; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering or soliciting on hotel grounds.

72.     D.R.T.  was repeatedly raped and otherwise sexually abused many times at the Buena Park Motel 6.

73.     Based on information and belief, before and at the time D.R.T.  was trafficked at the Buena Park Motel 6, G6 staff saw D.R.T.  being held captive, controlled, drugged, abused, hit, and trafficked for sex there. G6 and their employees directly witnessed all signs of sex trafficking, including the trafficking of D.R.T., described above.

74.     G6 knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for prolonged stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and out of the rooms where victims were trafficked in; allowing guests to use illicit drugs on property; allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

75.     G6 has direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and

other signs of trafficking.

76.     Based upon information and belief, G6 read all online reviews about their property. Numerous reviews were left online about Buena Park Motel 6 that directly put G6 on notice of red flags of sex trafficking, including during 2015 through 2016. Reviews specifically mention presumed prostitution activity on the property and drug activity.

77.     Information has become public through news stories establishes the pervasive nature of the Defendants role in providing a venue where sex trafficking has occurred for years. Not only at the location D.R.T. was trafficked, but also at G6 hotel locations across the country.

78.     As such, G6 knew and should have known that D.R.T. was being trafficked at the Buena Park Motel 6.

79.     At all times relevant, during 2015 through 2016, G6 profited and directly benefited from the room rentals and other good and things purchased as a direct result of their participation in the sex trafficking venture with D.R.T. 's trafficker for her sex trafficking.

**THE SEX TRAFFICKING OF D.R.T. AT THE CHULA VISTA RED ROOF PLUS+**

80.     Plaintiff D.R.T. was subjected to sex trafficking at the branded Red Roof Plus+ located at 394 Broadway, Chula Vista, CA 91910.

81.     D.R.T. and her trafficker stayed at the Red Roof Plus+ throughout 2020, frequently staying for days at a time, encountering the same staff, within this period. D.R.T. was kept at this property for roughly three (3) months prior to her escape.

82.     Hotel staff at Chula Vista Red Roof Plus+ always placed D.R.T. and her trafficker in a room away from other guests. There were only male guests in and out of D.R.T. and her trafficker's room while multiple girls were kept in a room at once.

83.     Staff at the Chula Vista Red Roof Plus+ would text D.R.T. or her trafficker's

personal phone when police were on the way to the property.

84.     On more than one occasion, D.R.T.'s traffickers physically abused her at the Chula Vista Red Roof Plus+.

85.     D.R.T.'s pain and suffering at the Chula Vista Red Roof Plus+ was ongoing, as loud sounds of abuse and D.R.T.'s screams for help could often be heard from the room.

86.     Further, D.R.T.'s stays at the Chula Vista Red Roof Plus+ resulted in several consistent red flags, including, but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; large number of condoms in the trash; physical abuse in public spaces; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; asking the front desk not to be disturbed; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms;  living out of hotel room; and loitering or soliciting on hotel grounds.

87.     D.R.T. was repeatedly raped and otherwise sexually abused many times at the Chula Vista Red Roof Plus+.

88.     Based on information and belief, before and at the time D.R.T. was trafficked at the Chula Vista Red Roof Plus+, Red Roof staff saw D.R.T. being held captive, controlled, drugged, abused, hit, and trafficked for sex there. Red Roof and their employees directly witnessed all signs of sex trafficking, including the trafficking of D.R.T., described above.

89.     Red Roof knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for

prolonged stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and out of the rooms where victims were trafficked in; allowing guests to use illicit drugs on property; allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

90.     Red Roof has direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

91.     Based upon information and belief, Red Roof read all online reviews about their property. Numerous reviews were left online about Chula Vista Red Roof Plus+ that directly put Red Roof on notice of red flags of sex trafficking, including in 2020. Reviews specifically mention prostitution on the property, drug deals in the parking lot, underage hookers, people screaming "at the top of their lungs", and blood throughout rooms. It is known that Red Roof read and acknowledged these reviews, as management responded to many reviews.

92.     Information has become public through news stories establishes the pervasive nature of the Defendants role in providing a venue where sex trafficking has occurred for years. Not only at the location D.R.T. was trafficked, but also at Red Roof hotel locations across the country.

93.     As such, Red Roof knew and should have known that D.R.T. was being trafficked at the Chula Vista Red Roof Plus+.

94.     At all times relevant, throughout 2020, Red Roof profited and directly benefited from the room rentals and other good and things purchased as a direct result of their participation in the sex trafficking venture with D.R.T.'s trafficker for her sex trafficking.

## DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR BRANDED LOCATIONS

95.     Defendants Wyndham, G6 and Red Roof aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[25] The United Nations,[26] international non-profits,[27] and the U.S. Department of Homeland Security,[28] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

96.     For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and

---

[25] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[26] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press-releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[27] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[28] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

97.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[29] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[30] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

98.     Defendants Wyndham, G6 and Red Roof, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking.  The Defendants nevertheless do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

99.     Defendants Wyndham, G6 and Red Roof also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

---

[29]      *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heino us%20crime.
[30]      *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

100.     Defendants Wyndham, G6 and Red Roof have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

## DEFENDANTS FACILITATED AND HARBORED THE TRAFFICKING OF PLAINTIFF

101.     Defendants Wyndham, G6 and Red Roof are signatories of the Code[31] and thereby has promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

102.     Defendant G6 is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and G6 publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, G6 should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

103.     Defendant Wyndham is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Red Roof publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

104.     Defendant Red Roof is a face and signatory to the ECPAT anti-trafficking

---

[31] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

knowledge, guidance, and information necessary to prevent human trafficking, and Red Roof publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Red Roof should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

105.     Defendants profited from the sex trafficking of Plaintiff. Defendants rented rooms to and provided Wi-Fi to Plaintiff's trafficker when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where Plaintiff was trafficked. The hotel staff, especially front desk staff, at Defendants' properties knew or should have known of the obvious signs of Plaintiff's trafficking.

106.     Defendants benefited from the steady stream of income that Plaintiff's trafficker and "johns" bring to their hotel brands. Defendants profited from each and every room that Plaintiff's trafficker and customers rented where Plaintiff was harbored and maintained for the purpose of sex trafficking. In addition, Defendants profited from data collected each and every time Plaintiff's trafficker and customers used Defendants' Wi-Fi to advertise and solicit Plaintiff for commercial sex.

107.     Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of the benefits they were receiving from the human trafficking occurring at the locations where Plaintiff was trafficked given Defendants access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

108.     Moreover, Defendants repeatedly collected data on Plaintiff, her trafficker, and her "johns" from her many stays at Defendants hotels, including but not limited to room reservations,

identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendant's employees witnessed the obvious signs of Plaintiff's trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for months, Defendants failed to take reasonable measures to stop benefitting from sex trafficking occurring in their hotels. If Defendants would have taken proper measures, Defendants would not have profited from Plaintiff and other victims like her being trafficked at their locations.

109. Defendants discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where Plaintiff was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

110. Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the properties where Plaintiff was trafficked and reported this to Defendants or would have if Defendants did not fail to institute reasonable policies and procedures.

111. In addition, Defendants had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

112.    Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

    a.  Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

    b.  Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

    c.  Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

    d.  Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

    e.  Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

    f.  Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

    g.  Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

113.    As a direct and proximate result of these egregious practices on the part of the

Defendants, Plaintiff and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

<u>The Franchisee Facilitated D.R.T.'s Trafficking at the Buena Park Days Inn</u>

114.    The Franchisee is responsible for the acts, omissions, and knowledge of all employees of Buena Park Days Inn when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Franchisee ratified these acts and omissions, and because Franchisee failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee, of sex trafficking occurring at Wyndham branded locations including the Buena Park Days Inn.

115.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Buena Park Days Inn, Franchisee continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including D.R.T.

116.    Franchisee knew or was willfully blind to the fact that D.R.T. was being trafficked, and despite this, benefited from continued association with her trafficker by providing a venue in the form of hotel rooms and related services, to facilitate D.R.T.'s sexual exploitation.

117.    Franchisee knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue and other benefits by facilitating that trafficking.

118.    Franchisee facilitated widespread trafficking at the Buena Park Days Inn, including the trafficking of D.R.T., in ways including:

    a.  Allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

    b.  Inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

    c.  Choosing not to report known or suspected criminal activity including sex

trafficking to appropriate law enforcement agencies;

d. Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

<u>The Franchisee Facilitated D.R.T.'s Trafficking at the San Bernardino Motel 6 and the Buena Park Motel 6</u>

119.    The Franchisees are responsible for the acts, omissions, and knowledge of all employees of San Bernardino Motel 6 and Buena Park Motel 6 when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Franchisees ratified these acts and omissions, and because Franchisees failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisees, of sex trafficking occurring at G6 branded locations including the San Bernardino Motel 6 and Buena Park Motel 6.

120.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the San Bernardino Motel 6 and Buena Park Motel 6, Franchisees continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including D.R.T.

121.    Franchisees knew or were willfully blind to the fact that D.R.T. was being trafficked, and despite this, benefited from continued association with her trafficker by providing a venue in the form of hotel rooms and related services, to facilitate D.R.T.'s sexual exploitation.

122.    Franchisees knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue and other benefits by facilitating that trafficking.

123.    Franchisees facilitated widespread trafficking at the San Bernardino Motel 6 and Buena Park Motel 6, including the trafficking of D.R.T., in ways including:

a. Allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues

related to human trafficking;

b.   Inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c.   Choosing not to report known or suspected criminal activity including sex trafficking to appropriate law enforcement agencies;

d.   Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

<u>The Franchisee Facilitated D.R.T.'s Trafficking at the Chula Vista Red Roof Plus+</u>

124.    The Franchisee is responsible for the acts, omissions, and knowledge of all employees of Chula Vista Red Roof Plus+ when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Franchisee ratified these acts and omissions, and because Franchisee failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee, of sex trafficking occurring at Red Roof branded locations including the Chula Vista Red Roof Plus+.

125.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Chula Vista Red Roof Plus+, Franchisee continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including D.R.T.

126.    Franchisee knew or was willfully blind to the fact that D.R.T. was being trafficked, and despite this, benefited from continued association with her trafficker by providing a venue in the form of hotel rooms and related services, to facilitate D.R.T.'s sexual exploitation.

127.    Franchisee knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue and other benefits by facilitating that trafficking.

128.    Franchisee facilitated widespread trafficking at the Chula Vista Red Roof Plus+,

46

including the trafficking of D.R.T., in ways including:

    a. Allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

    b. Inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

    c. Choosing not to report known or suspected criminal activity including sex trafficking to appropriate law enforcement agencies;

    d. Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

## DEFENDANT'S CONTROL OVER THEIR BRANDED PROPERTIES

### Wyndham

129.    Wyndham exercises day-to-day control over Buena Park Days Inn and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Wyndham implements and retains brand hotel control over, including control over Buena Park Days Inn, as either direct subsidiaries or under the terms of its franchise agreements.

130.    Upon information and belief, Wyndham controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. Requiring the branded locations to use Wyndham's centralized property management, data management, and reservation and billing systems;

    b. Gathering reports of data generated by branded locations including guest information, reservation, payment, and occupancy information through Wyndham's centralized systems;

    c. Conducting regular quality assurance inspections and audits for compliance with

franchise agreement terms and Wyndham's rules and regulations;

d. Requiring brands to purchase products through Wyndham's e-procurement marketplace system or from approved suppliers;

e. Requiring branded properties to pay fees based of the percentage of gross room revenues;

f. Providing advertising requirements and standardized marketing services for the branded locations;

g. Requiring branded hotels to use approved vendors for internet services or other requirements for cybersecurity and technology;

h. Requiring all fixtures, furnishings, equipment, signs, services, materials, and supplies to meet Wyndham's strict standards and specifications;

i. Regulating employment policies at branded location including training and orientation materials for staff;

j. Requiring branded locations to make modifications to the branded properties upon Wyndham's request and to refrain from make substantial changes to the branded property without Wyndham's permission;

k. Regulating the rates for room rentals; and

l. Insurance coverage requirements.

131. Wyndham jointly employs all staff located at Beuna Park Days Inn where D.R.T. was trafficked.

132. Wyndham manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related

policies published and communicated via property management systems with back-end management by Wyndham.

133.     Wyndham controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Wyndham's website, and mentions across its corporate media channels.

134.     Wyndham requires branded properties to use a centralized, cloud-based reservation and property management system.

135.     Wyndham gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.

136.     Wyndham requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives Wyndham the ability to access, monitor, and harvest that internet data.

137.     Wyndham requires branded properties to comply with its corporate policies relating to Safety and Security, Codes of Conduct, Ethics, Economic, Social, Governance, and compliance with the laws

**G6**

138.     G6 exercises day-to-day control over the San Bernardino Motel 6, Beuna Park Motel 6 and its other brand hotels through centralized corporate systems, training, policies, and brand standards. G6 implements and retains brand hotel control over, including control over San Bernardino Motel 6 and Beuna Park Motel 6, as either direct subsidiaries or under the terms of its franchise agreements.

139.     Upon information and belief, G6 controls the operations of its branded properties

through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

a. Requiring the branded locations to use G6's centralized property management, data management, and reservation and billing systems;

b. Gathering reports of data generated by branded locations including guest information, reservation, payment, and occupancy information through G6's centralized systems;

c. Conducting regular quality assurance inspections and audits for compliance with franchise agreement terms and G6's rules and regulations;

d. Requiring brands to purchase products through G6's e-procurement marketplace system or from approved suppliers;

e. Requiring branded properties to pay fees based of the percentage of gross room revenues;

f. Providing advertising requirements and standardized marketing services for the branded locations;

g. Requiring branded hotels to use approved vendors for internet services or other requirements for cybersecurity and technology;

h. Requiring all fixtures, furnishings, equipment, signs, services, materials, and supplies to meet G6's strict standards and specifications;

i. Regulating employment policies at branded location including training and orientation materials for staff;

j. Requiring branded locations to make modifications to the branded properties upon G6's request and to refrain from make substantial changes to the branded property without G6's permission;

k. Regulating the rates for room rentals; and

l. Insurance coverage requirements.[32]

140. G6 jointly employs all staff located at the San Bernardino Motel 6 and Beuna Park Motel 6 where D.R.T. was trafficked.

141. G6 manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by G6.

142. G6 controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on G6's website, and mentions across its corporate media channels.[33]

143. G6 requires branded properties to use a centralized, cloud-based reservation and property management system.[34]

144. G6 gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[35]

145. G6 requires its hotels to carry Wi-Fi internet access with certain cybersecurity

---

[32] *See e.g.* 2017 Motel 6 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/motel-6-2017-fdd-summary/motel-6-2017-fdd/
[33] G6 offers a centralized reservations system on its website, a customer support channel, and press releases and announcements about the Motel 6 brand through g6hospitality.com; G6 also offers a reward program specific to the Motel 6 brand. *See Join My6,* MOTEL 6, https://www.motel6.com/en/home/my6/join.html
[34] *See* Michal Christine Escobar, *2020 Enterprise Innovator: Motel 6,* HOSPITALITY TECHNOLOGY, https://hospitalitytech.com/2020-enterprise-innovator-motel-6
[35] G6 Hospitality. *Privacy Policy,* https://www.motel6.com/en/home/policies/privacy-policy.html

measures in place which gives G6 the ability to access, monitor, and harvest that internet data.[36]

146.      G6 requires branded properties to comply with its corporate policies relating to Safety and Security, Codes of Conduct, Ethics, Economic, Social, Governance, and compliance with the law.[37]

## RED ROOF PLUS+

147.      Red Roof exercises day-to-day control over Chula Vista Red Roof Plus+ and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Red Roof implements and retains brand hotel control, including control over Chula Vista Red Roof Plus+, as either direct subsidiaries or under the terms of its franchise agreements.

148.      Red Roof controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts and monitors compliance, including but not limited to:

a.   Providing the software, hardware, and platforms where data and information is shared with Red Roof corporate and monitors compliance;

b.   Providing reservation platforms where payment modes and suspicious reservations would suggest trafficking and monitors compliance;

c.   Providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

d.   Providing and controlling customer review and response platforms and monitors compliance;

e.   Monitoring customer reviews and response platforms;

---

[36]    Motel 6, *Web and Mobile Ethical Vulnerability Disclosure Policy,* https://www.motel6.com/en/home/policies/vulnerability-disclosure.html
[37] *Combatting Human Trafficking,* G6 HOSPITALITY, https://g6hospitality.com/about-us/combating-human-trafficking/

f.   Hosting and monitoring online bookings on Red Roof's domain;

g.   Requiring the use of Red Roof's online bookings ;

h.   Monitoring online bookings;

i.   Requiring branded hotels to use Red Roof's customer rewards program;

j.   Monitoring branded hotels to use Red Roof's customer rewards program;

k.   Requiring branded hotels to use Red Roof's property management software;

l.   Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

m.   Providing IT support for all property management systems, owned, operated, and required by Red Roof;

n.   setting employee wages;

o.   sharing profits;

p.   standardizing training methods for employees;

q.   building and maintaining the facility in a manner specified by the owner;

r.   standardized or strict rules of operation;

s.   regular inspection of the facility and operation by owner; and

t.   fixing prices.[38]

149.    Red Roof manages and monitors compliance of corporate training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end

---

[38] *See* 2021 Franchisee Disclosure Document, https://franchimp.com/?page=pdf&f=105990_2021.pdf

management by Red Roof.[39]

150.     Red Roof controls and monitors compliance of uniform and required reservation, marketing, customer support systems and loyalty programs at its brand hotels, including Chula Vista Red Roof Plus+.[40] Red Roof also advertises its brand hotels through national press releases, newsletters, emails, announcements on redroof.com, and mentions across its corporate media channels.[41]

151.     Red Roof requires its hotels to use a consolidated IT system and database for property management, credit processing and centralized billing, as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated and monitors compliance.[42]

152.     Red Roof boasts of its "Streamlined Technology" and "Shared Success" with its brand hotels. To "make operations as easy and seamless as possible," Red Roof controls "a fully integrated database" which its brand hotels must use to access customer data and reservations, among other information shared system-wide between Red Roof and its brand hotels.[43] Red Roof's privacy policy states that it collects information such as contact information, demographics,

---

[39] *See e.g.*, *Brand Support*, RED ROOF, https://www.redrooffranchising.com/brand-support (last visited Jun. 9, 2022) ("We support our franchisees with extensive on-site training.  On everything from  helping  with pricing  strategy  and  operational  expense  management,  to  assistance  with  marketing  and  operation programs…Our  cost-effective  sourcing  solutions,  efficient  technology  support,  and  incredible  property management system add even more value to your Red Roof franchise.")

[40] *Id.*
[41] *Brand Marketing*, RED ROOF, https://www.redrooffranchising.com/brand-marketing (last visited Jun. 9, 2022) ("From your grand opening to being fully operational, our team helps you market your property every step of the way. We provide property-specific design services for print materials—like flyers and rack cards—and even help with billboards, transit advertising, and other local promotional needs.")
[42] *See* Red Roof Franchising, available at https://www.redrooffranchising.com/technology; *See also Sales Team,* RED ROOF, https://www.redrooffranchising.com/sales-team (last visited Jun. 9, 27 2022) (corporate Red Roof employees provide brand staff with "regional events, webinars, and in-person visits" alongside training, other support, and "RediBill® Brand-Wide Direct Billing" centralized billing program).
[43] *Technology*, RED ROOF, https://www.redrooffranchising.com/technology (last visited Jun. 9, 2022); see also *Privacy Policy*, RED ROOF, https://www.redroof.com/privacy-policy (last visited Jun. 9, 2022).

financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.[44] Red Roof monitors this technology.

153.     Red Roof also sets, controls, and monitors Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Chula Vista Red Roof Plus+.[45]

154.     In addition, through an integrated corporate marketplace, Red Roof mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including Chula Vista Red Roof Plus+ and monitors compliance.[46]

155.     Under the guise of maintaining its "brand standards," Red Roof forces its brand hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[47]

156.     Red Roof posts job openings for its branded properties on its central career positing website.[48] Red Roof provides benefits to employees of its branded properties, and upon information and belief controls the terms and conditions of their employment.[49]

**DEFENDANTS ARE JOINTLY AND SEVERALLY LIABLE FOR D.R.T.'S DAMAGES**

---

[44] *Id.*

[45] *See* sigmawifi Red Roof Inn Case Study, *available at* https://www.sigmawifi.com/red-roof-inn-nh-case-study/

[46] See *Operational Support Procurement Services*, RED ROOF, https://www.redrooffranchising.com/operational-support (last visited Jun. 6, 2022).

[47] *See Design and Construction,* RED ROOF, https://www.redrooffranchising.com/design-and-constuction (last visited Jun. 9, 2022).

[48] *See* https://www.redroofjobs.com/

[49] *Id.*

157.    The venture or ventures in which each Defendant participated were direct, producing and proximate causes of the injuries and damages to D.R.T.

158.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to D.R.T.  for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA") (AGAINST ALL DEFENDANTS)

159.    Plaintiff incorporates each foregoing allegation in paragraphs 1 through 158.

160.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

161.    Furthermore, Defendants acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of D.R.T.  and her trafficker for the purposes of commercial sex induced by force, fraud, or coercion.

162.    Defendants have continued to benefit as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion, they received payment for rooms or kickbacks from internet usage, contributing to their direct financial benefit from the sex trafficking of D.R.T. when they knew or should have known that violations of

§1595(a) were occurring.

163.     Despite Defendants' knowledge of D.R.T.'s sex trafficking, D.R.T.'s trafficker were able to continue renting rooms for the sexual exploitation of D.R.T.

164.     Defendants participated in a venture together and with, among others, D.R.T.'s traffickers. Defendants had an ongoing business relationship and association in fact with D.R.T.'s trafficker. Despite knowing or having reason to know that D.R.T. was being sex trafficked in violation of the TVPRA, Defendants continued to rent rooms to her trafficker, providing a secure venue for D.R.T.'s sexual exploitation. D.R.T.'s sex trafficker used Defendants' Hotels and Motels because they knew that staff members looked the other way despite obvious signs of trafficking. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits. Defendants profited while D.R.T.'s trafficker was able to rent a secure venue to earn profits by trafficking D.R.T.  Defendants participated in the venture by continually renting rooms to D.R.T.'s trafficker, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of D.R.T.'s trafficking.

165.     Defendants' failure to train and supervise their agents and employees, as well as their disregard for the welfare of their guests, including D.R.T., enabled and contributed to her sex trafficking.

166.     The facts alleged establish that Defendants knowingly benefited, financially or by receiving anything of value, from participating in a venture that Defendants knew or should have known has engaged in an act in violation of the TVPRA.

167.     Plaintiff D.R.T.  has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and motels. The actions,

omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages, therefore Defendants are jointly and severally liable.

### COUNT 2: 18 U.S.C. § 2255(A) CHILD ABUSE VICTIMS RIGHTS ACT ("CAVRA") (AGAINST ALL DEFENDANTS)

168.    Plaintiff incorporates each forgoing allegation.

169.    Plaintiff was a "minor" pursuant to 18 U.S.C. § 2255(a) when she was trafficked.

170.    Plaintiff was the "victim" of violations of 18 U.S.C. §§ 1589, 1590, and 1591.

171.    Plaintiff suffered "personal injury" pursuant to 18 U.S.C. § 2255(a) as a result of those violations.

172.    Plaintiff was a "person" who "has not attained the age of 18 years" pursuant to 18 U.S.C. § 1591(a)(2).

173.    Defendants knew or should have known that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause Plaintiff to engage in a commercial sex act, pursuant to 18 U.S.C. § 1591(a)(2).

174.    Defendants knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her trafficker rooms in hotels and Wi-Fi used advertise Plaintiff and solicit customers affecting interstate commerce where authorities were unlikely to discover the injuries being sustained by Plaintiff.

175.    Defendants knowingly benefited, financially or by receiving anything of value, from participation in ventures of renting rooms and providing Wi-Fi that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff to engage in commercial sex acts.

176. Defendants engaged in a conspiracy to ignore and actively refrain from engaging in any conduct that would prevent them from profiting from sex trafficking at their branded properties.

177. Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a. Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b. Disgorgement of profits obtained through unjust enrichment;

c. Restitution;

d. Statutory and/or treble damages, where available;

e. Punitive damages;

f. Attorneys' fees and expenses;

g. The costs of this action;

h. Pre- and post-judgment interest; and

i. Any other relief the Court or jury deems appropriate.

## **JURY DEMAND**

Plaintiff hereby demands a trial by a struck jury.

Dated: September 23, 2025

                                              Respectfully submitted,

                                              */s/ Penny L. Barrick*

                                              Penny L. Barrick (0074110)
                                              Steven C. Babin, Jr. (0093584)
                                              Jeremy W. Hoshor-Johnson (0075502)
                                              Babin Law, LLC
                                              10 West Broad Street, Suite 900
                                              Columbus, Ohio 43215
                                              T: 614-761-8800
                                              E: Steven.babin@babinlaws.com /
                                              Penny.barrick@babinlaws.com /
                                              Jeremy.hoshorjohnson@babinlaws.com